1
2
3
4
5
6
7
8                           UNITED STATES DISTRICT COURT

9                        FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    ERIC ANTHONY ALSTON, JR.,                No.  2:21-cv-2049 DAD AC PS

12              Plaintiff,

13         v.                                   FINDINGS AND RECOMMENDATIONS

14    CITY OF SACRAMENTO; SGT. HAMM,
      #3018; OFFICER DELGADO, #358;
15    OFFICER MELLOCH, #602,

16              Defendants.

17

18         Plaintiff is proceeding in this action pro se and the case was accordingly referred to the

19    undersigned by Local Rule 302(c)(21).  Defendants move for summary judgment.  ECF No. 32.

20    Plaintiff filed an untimely opposition to the motion.  ECF No. 35.  Defendants replied.  ECF No.

21    36.  In the interest of justice and judicial economy, the court has fully considered all papers and

22    argument, including plaintiff's untimely opposition.  For the reasons explained below,

23    defendants' motion should be GRANTED.

24                              **I.      Procedural Background**

25         Plaintiff filed this civil rights action under 42 U.S.C. § 1983 for violations of his First,

26    Fourth, Fifth, and Fourteenth Amendment rights, along with related state law claims, on

27    November 5, 2021.  ECF No. 1.  Plaintiff paid the filing fee and did not seek in forma pauperis

28    status, so the complaint was not screened under 28 U.S.C. § 1915(e)(2).  The complaint presents

                                              1

eight causes of action, all arising from the police response to a home in the Meadowview area of Sacramento on October 6, 2021.  Plaintiff was attending a celebration of life for his cousin at the house when he heard gunshots.  When the police arrived, they handcuffed plaintiff and put him into a patrol car where he was detained for over an hour.  The complaint also alleges that many other Black men at the scene were wrongfully handcuffed and detained.

The complaint presents the following claims: (1) unreasonable seizure/false arrest/imprisonment in violation of the Fourth Amendment, under 42 U.S.C. § 1983; (2) violation of First Amendment right to free speech, under § 1983; (3) excessive force in violation of the Fourth Amendment, under § 1983; (4) excessive force/illegal detainment under California Constitution and Bane Act; (5) violation of Fifth Amendment right to remain silent, under § 1983; (6) violation of Equal Protection Clause, under § 1983; (7) battery under California law; and (8) false imprisonment under California law.  ECF No. 1.

Plaintiff filed a premature motion for summary judgment (ECF No. 7), which was withdrawn after discussion at the initial scheduling conference (ECF No. 15).  Discovery closed on February 2, 2023, and the dispositive motions deadline was July 31, 2023.  ECF No. 16.  Plaintiff filed a second motion for summary judgment (ECF No. 18), which was fully briefed and thereafter denied.  ECF Nos. 25 and 29.  Trial is currently scheduled for November 27, 2023.  ECF No. 16.

The instant motion seeks judgment in defendants' favor as a matter of law on all claims.  As to the federal claims, defendants contend that the individual officers are entitled to qualified immunity and that plaintiff has provided no evidentiary foundation for municipal liability.

## II.      Legal Standards

A.  <u>Summary Judgment under Rule 56</u>

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Under summary judgment practice, "[t]he moving party initially bears the burden of proving the absence of a genuine issue of material fact."  <u>In re Oracle Corp. Sec. Litig.</u>, 627 F.3d 376, 387 (9th Cir. 2010) (citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986)).  The

1   moving party may accomplish this by "citing to particular parts of materials in the record,

2   including depositions, documents, electronically stored information, affidavits or declarations,

3   stipulations (including those made for purposes of the motion only), admissions, interrogatory

4   answers, or other materials" or by showing that such materials "do not establish the absence or

5   presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to

6   support the fact." Fed. R. Civ. P. 56(c)(1).

7          Summary judgment should be entered, "after adequate time for discovery and upon

8   motion, against a party who fails to make a showing sufficient to establish the existence of an

9   element essential to that party's case, and on which that party will bear the burden of proof at

10  trial." Celotex, 477 U.S. at 322. "[A] complete failure of proof concerning an essential element

11  of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 323. In such

12  a circumstance, summary judgment should "be granted so long as whatever is before the district

13  court demonstrates that the standard for the entry of summary judgment, as set forth in Rule

14  56(c), is satisfied." Id.

15         If the moving party meets its initial responsibility, the burden then shifts to the opposing

16  party to establish that a genuine issue as to any material fact actually does exist. Matsushita Elec.

17  Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). In attempting to establish the

18  existence of this factual dispute, the opposing party may not rely upon the allegations or denials

19  of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or

20  admissible discovery material, in support of its contention that the dispute exists. See Fed. R.

21  Civ. P. 56(c). The opposing party must demonstrate that the fact in contention is material, i.e., a

22  fact "that might affect the outcome of the suit under the governing law," Anderson v. Liberty

23  Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809

24  F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., "the evidence is such that a

25  reasonable jury could return a verdict for the nonmoving party," Anderson, 477 U.S. at 248.

26  In the endeavor to establish the existence of a factual dispute, the opposing party need not

27  establish a material issue of fact conclusively in its favor. It is sufficient that "'the claimed

28  factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the

1  truth at trial.'"  T.W. Elec. Service, Inc., 809 F.2d at 630 (quoting First Nat'l Bank of Ariz. v.

2  Cities Serv. Co., 391 U.S. 253, 288-89 (1968)).  Thus, the "purpose of summary judgment is to

3  pierce the pleadings and to assess the proof in order to see whether there is a genuine need for

4  trial."  Matsushita, 475 U.S. at 587 (citation and internal quotation marks omitted).

5       "In evaluating the evidence to determine whether there is a genuine issue of fact, [the

6  court] draw[s] all inferences supported by the evidence in favor of the non-moving party."  Walls

7  v. Cent. Costa County Transit Auth., 653 F.3d 963, 966 (9th Cir. 2011) (citation omitted).  It is

8  the opposing party's obligation to produce a factual predicate from which the inference may be

9  drawn.  See Richards v. Neilsen Freight Lines, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to

10 demonstrate a genuine issue, the opposing party "must do more than simply show that there is

11 some metaphysical doubt as to the material facts."  Matsushita, 475 U.S. at 586 (citations

12 omitted).  "Where the record taken as a whole could not lead a rational trier of fact to find for the

13 non-moving party, there is no 'genuine issue for trial.'"  Id. at 587 (quoting First Nat'l Bank, 391

14 U.S. at 289).

15     B.  Qualified Immunity

16      Government officials are immune "from liability for civil damages insofar as their

17 conduct does not violate clearly established statutory or constitutional rights of which a

18 reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).

19 "Qualified immunity balances two important interests—the need to hold public officials

20 accountable when they exercise power irresponsibly and the need to shield officials from

21 harassment, distraction, and liability when they perform their duties reasonably."  Pearson v.

22 Callahan, 555 U.S. 223, 231 (2009).  Ideally, qualified immunity is determined at the earliest

23 possible stage in litigation to avoid unnecessary burden and expense.  Hunter v. Bryant, 502 U.S.

24 224, 227 (1991)).

25      In Saucier v. Katz, 533 U.S. 194 (2001) (overruled in part by Pearson, 555 U.S. 223), the

26 Supreme Court set forth a two-part inquiry for determining whether qualified immunity applies.

27 First, a court must ask, "[t]aken in the light most favorable to the party asserting the injury, do the

28 facts alleged show the officer's conduct violated a constitutional right?"  Id.  If so, the court must

ask whether the constitutional right was "clearly established." Id.  This second inquiry must be undertaken in the specific context of the case. Id.  In Pearson v. Callahan, the Supreme Court removed any requirement that the Saucier test be applied in a rigid order, holding "[t]he judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." Pearson, 555 U.S. at 236.

"The plaintiff bears the burden of proof that the right allegedly violated was clearly established." Tarabochia v. Adkins, 766 F.3d 1115, 1125 (9th Cir. 2014) (internal quotation marks omitted).  "To meet this standard the very action in question need not have previously been held unlawful." Id. (internal quotation marks omitted).  This is especially the case in the context of alleged Fourth Amendment violations, where the constitutional standard of "reasonableness" requires a fact-specific inquiry.  Mattos v. Agarano, 661 F.3d 433, 442 (9th Cir. 2011) (en banc).  The court must determine "whether a reasonable officer would have had fair notice that the action was unlawful[.]" Tarabochia, 766 F.3d at 1125 (internal quotation marks and brackets omitted).  At its base, "[t]he qualified immunity doctrine rests on a balance between, on the one hand, society's interest in promoting public officials' observance of citizens' constitutional rights and, on the other, society's interest in assuring that public officials carry out their duties and thereby advance the public good." Beier v. City of Lewiston, 354 F.3d 1058, 1071 (9th Cir. 2004).

### III.    Statement of Undisputed Facts

Unless otherwise specified, the following facts are either expressly undisputed by the parties or have been determined by the court, upon a full review of the record, to be undisputed by competent evidence.  A comprehensive statement of disputed and undisputed facts, containing defendants' initial statement, plaintiff's response, and defendants' reply, is located at ECF No. 36-1.[1]

On the evening of October 6, 2021, gun shots were heard by individuals inside the home at 2027 O'Neil Way in Sacramento.  ECF No. 36-1 at 1.  Multiple shots were heard in the

---

[1]  See also, ECF No. 32-2 (defendants' separate statement of undisputed facts); ECF No. 35-2 (plaintiff's opposition to undisputed facts).

1    vicinity, and the Sacramento Police Department received multiple calls reporting gunshots

2    outside 2027 O'Neil Way.  Id. at 2.  Plaintiff himself heard "probably more than 10" rounds fired,

3    "sounding like someone with an assault rifle."  Alston Depo. at 59:18-21 (ECF No. 32-3 at 12).

4    Police officers responded to the scene.  Id. at 3.  Officers observed numerous shell casings in the

5    roadway.  Id.  Officers observed that there was a party or similar gathering at the residence.  Id.

6    Officers observed multiple individuals running away from 2027 O'Neil Way, and other

7    individuals running into the residence.  Id.  At least one individual was observed entering the

8    residence after discarding a firearm in front of the home.  Id.; Declaration of Officer Derek

9    Calabrese (Calabrese Decl.)[2] ¶ 8.

10          There were numerous individuals at the scene, some of whom appeared to the officers to

11   be intoxicated.  Calabrese Decl. ¶ 10; Declaration of Det. Eric Nedeljkovic (Nedeljkovic Decl.)[3] ¶

12   10.  Officers were concerned that additional individuals in and around 2027 O'Neil Way may

13   have had weapons.  Nedeljkovic Decl. ¶ 7; Calabrese Decl. ¶ 12.  Once additional officers

14   arrived, officers requested all individuals in the residence at 2027 O'Neil Way exit the home.

15   Nedeljkovic Decl. ¶ 8; Calabrese Decl. ¶ 13.

16          Officer Calebrese's body camera shows multiple individuals standing around the home in

17   question, with Calebrese speaking to a man whose hands are placed on his head.  ECF No. 30, Ex.

18   A (Calebrese Body Camera Footage).  Officer Calabrese asks if the man has a gun, and the man

19   responds that he does, in his pocket.  Id.  Officer Calebrese says "okay, we can all have a civilized

20   conversation, but there's a lot of guns here already."  Id.  He directs the man away from the

21   house.  Id.  Officer Calebrese says, "we need to identify everybody."  Id.

22          Plaintiff, Eric Alston, exited the home after police arrived.  ECF No. 36-1 at 4.  Mr.

23   Alston was patted down for weapons, and asked if he was on parole.  Id.  Plaintiff was not

24   initially placed in handcuffs after being patted down for weapons.  Id.  Officer Delgado asked

25   plaintiff to move toward the street, away from the home.  Delgado Interrogatory Responses (ECF

26   No. 35-1) at 5.  Rather than walk toward the street, plaintiff approached another officer on the

27   _____

28   [2]  ECF No. 32-4.
     [3]  ECF No. 32-7.

scene, and was again directed toward the street and away from the house.  ECF No. 19, Ex. A (Delgado Body Camera Footage).  While the other officer directed plaintiff again to move away from the house, Officer Delgado approached plaintiff and took him by the arm, leading him away from the house.  Id.  Plaintiff said "hey, don't touch me man" and Officer Delgado replied, "you can go by handcuffs too."  Id.  Plaintiff and Officer Delgado briefly and inaudibly conversed, and when they reached the sidewalk Officer Delgado said, "Ok, you're going to go in handcuffs then" and placed handcuffs on plaintiff with plaintiff's hands behind his back.  Id.  Officer Delgado stated, "there's a whole bunch of guys in there, there's just been a shooting."  Id.  Plaintiff told Officer Delgado that he was violating his constitutional rights, and Officer Delgado replied, "you're not under arrest, you're being detained."  Id.

Officer Delgado walked plaintiff to the front of a police car.  Id.  Plaintiff continued to repeat that his Fourth Amendment rights were being violated.  Id.  Officer Delgado stated, "you're being detained because you're making it unsafe for everybody."  Id.  Plaintiff asked "do you have your camera on" several times.  Id.  Plaintiff repeated "I've done nothing wrong" and "I was only trying to assist you" several times.  Id.  Plaintiff was directed to a police car and directed to get in.  Id.  Plaintiff asked, "can you pull my pants up so I can stand up sir."  Id.  The officer obliged, plaintiff said, "thank you sir" and placed himself in the car with no physical assistance from any officer.  Id.

Plaintiff was kept in handcuffs for approximately 20 minutes.  ECF No. 36-1 at 10.  After entering the patrol car, plaintiff invoked his Fifth Amendment rights, but continued to speak and pose questions to the officers.  ECF No. 7, Ex. A (AXON BODY 3 camera footage).  The vehicle patrol camera shows plaintiff sitting in the patrol car, stating at the 1 minute and 23 second mark, "I need medical, I have wrist issues sir."  ECF No. 7, Ex. A (Patrol Vehicle Camera).  An officer outside the car tells plaintiff "we need to make sure it's cleared first" and plaintiff replies, "well you need to call medical sir."  Id.  The officer asked plaintiff what his name was, and plaintiff refused to provide it.  Id.  At the 16:35 mark on the patrol vehicle camera, plaintiff calls to an officer outside the vehicle and says, "I've got carpel tunnel sir" and asks for his handcuffs to be removed.  Id.  Plaintiff exits the car, his handcuffs are removed, and he is

1   returned to the car at the 18:27 mark.  Id.  When plaintiff re-enters the car without handcuffs, he

2   yells "get my phone" to someone outside the car, and states "record, he's violating my First

3   Amendment rights."  Id.  A person outside the car says "Eric, please just stop, just relax" and,

4   after unintelligible comments between the person outside the car and plaintiff, the person outside

5   the car says, "I have it."  Id.  The person outside the car repeatedly says, "just stop" and plaintiff

6   states, "I'm gonna sue him, I'm gonna sue him."  Id.  Plaintiff states "they're gonna get a lawsuit,

7   I have a right to record any interaction with the police department."  Id.

8        At the 23:78 mark on the patrol vehicle camera, plaintiff taps the window and gets the

9   attention of a person outside the vehicle.  Plaintiff states "are you recording, let me see it."  Id.  At

10  the 23:03 mark, plaintiff tells the person outside the vehicle to stop recording.  At the 43:39 mark,

11  plaintiff taps on the vehicle window.  Plaintiff states "that motherfucker said he was going to

12  bring medical man, my arm hurts."  Id.  Plaintiff begins to engage with someone outside the

13  vehicle whom he refers to as Melloch, though the officer is not visible from the camera angle,

14  again demanding medical attention for his arm.  Id.  The interaction ends at the 47:27 mark.  Id.

15  Another interaction begins with an officer at the 52:49 mark.  Id.  Plaintiff invokes his Fifth

16  Amendment rights, continues to demand to know what crime he is suspected of, and states that he

17  has a right to record any interaction with law enforcement.  Id.

18       At the 1:05:00 mark, another officer approaches.  Id.  Plaintiff immediately states, "I want

19  medical" and invokes his Fifth Amendment rights, before stating "what's going on sir."  Id.  The

20  officer responds, "I understand we haven't identified you yet."  Id.  Plaintiff says, "what does it

21  matter, what crime do you suspect me of sir."  Id.  The officer replies "this is a shooting

22  investigation" involving multiple firearms, and the officer explains that plaintiff is part of the

23  investigation for two reasons: "your proximity in both distance and time to that shooting."  Id.

24  The officer says "so, we will be identifying everybody" and offers plaintiff the opportunity to

25  identify himself.  Id.  The interaction continues, with plaintiff stating at the 1:07:37 mark "you

26  won't let me record" and the officer responding, "we don't let people have phones in the back of

27  the vehicles."  Id.  Plaintiff tells the officer that the Supreme Court says he is allowed to record

28  any interaction with law enforcement, to which the officer replies "unless you're detained."  Id.

At the 1:08:46 mark plaintiff again states that he is a prisoner, he is detained, he has not been given medical attention, he has carpel tunnel, and the handcuffs that were initially placed on him were too tight.  Id.  The officer responds, "it looks like you're free" and plaintiff says, "my left arm is fine, my right arm is numb."  Id.  Plaintiff and the officer continued to converse; the interaction ends at 1:12:15 on the patrol vehicle camera.  Id.  Officer Melloch approaches plaintiff at the 1:17:17 mark and asked, "can you get me your name so I can get you out of here?" to which plaintiff responded "Melloch, I'm invoking my Fifth, you have not told me, I will take this all the way, you don't want this, you have to tell me why I'm being detained."  Id.  The officer again asked for ID, and plaintiff again invoked his Fifth Amendment right.  Id.  Plaintiff repeatedly says, "take me to jail," and tells the officer to get his sergeant.  Id.  The interaction ends at 1:18:37.  Id.

At the 1:23:09 mark on the patrol vehicle camera, plaintiff taps on the window and says "are you guys going to take me to jail or what" and repeatedly says "take me to jail."  Id.  At the 1:23:35 mark, plaintiff begins speaking with an officer and states he is invoking his Fifth Amendment privilege, and then says "you gotta tell me why I am being detained."  Id.  The officer, Officer Nedeljkovic, explained that there were two clusters of bullet casings and a large gathering of people.  Id., ECF No. 7, Ex. A (AXON BODY 3 camera footage).  He goes on to explain that one subject threw a gun and went inside; another subject was "back here" and threw a gun at the speaking officer, and that subject was detained.  ECF No. 7, Ex. A (AXON BODY 3 camera footage).  The officer explained that "when officers come on to a scene like that where a shooting has occurred, there are bullets on the ground, and people are nearby, you are detained until we can figure out what is going on safely."  Id.  Plaintiff was told he was being detained for multiple reasons including because he was making the scene unsafe.  ECF No. 36-1 at 11.  Officer Nedeljkovic explained to Mr. Alston that because of the shooting individuals were being detained until officers could safely determine what occurred.  Id.  SPD officers were continuing to investigation the shooting while Mr. Alston was detained in the back of the police vehicle.  Id. at 12.  Plaintiff tells the Officer that Officer Delgado "still hasn't given me medical" and the Officer responded, "do you need medical?" to which plaintiff replied, "I need medical, I have carpel

tunnel." Id.  The officer asked, "do you want an ambulance?" and plaintiff replied "I want

medical." Id.  The officer tells another officer, "hey he wants an ambulance for his carpel

tunnel." Id.

The officer called a sergeant over to the vehicle in which plaintiff was detained.  Plaintiff

said he invoked his Fifth and Fourth Amendment rights, but continued to ask the officers "do you

suspect me of shooting a firearm," to which the original officer replied, "I explained it to you."

Officer Nedeljkovic stated, "so the easiest way to remedy this situation is us ID'ing you, and then

most likely, as long as you're . . ." during which plaintiff continually interrupted the officer

stating, "Fifth Amendment" and "take me to jail, take me to jail I know I haven't done anything

wrong." Id.  After the officers confer, at 1:27:49 on the patrol vehicle camera, plaintiff is

informed he is being released and he exits the vehicle saying, "where's medical."  Once outside

the vehicle plaintiff continues to demand medical.  ECF No. 7, Ex. A (Patrol Vehicle Cam).

Plaintiff was released from the police vehicle after being detained for approximately 90 minutes.

ECF No. 36-1 at 13.

**IV.    Analysis**

A.  Claim One: Unreasonable Detention (Fourth Amendment, 42 U.S.C. § 1983)

1.  Overview of the Claim

The complaint alleges that plaintiff's Fourth Amendment right against unreasonable

seizure was violated by his temporary detention during the investigation that immediately

followed police response to the reports of gunshots fired at or near 2027 O'Neil Way.  This claim

is stated against Officers Hamm, Delgado and Melloch individually, and against the City of

Sacramento.  ECF No. 1 at 6.

2.  Officer Liability

The individual officers argue that they are entitled to qualified immunity.  With respect to

both persons and property, "[t]he Fourth Amendment proscribes only 'unreasonable' searches and

seizures." Franklin v. Foxworth, 31 F.3d 873, 875 (9th Cir. 1994).  Whether a seizure is

unreasonable is measured by an objective test based on all the circumstances of a given situation:

"a detention may be unreasonable in a particular instance either because the detention itself is

improper or because it is carried out in an unreasonable manner."  Id. at 876.  Objective

reasonableness in the Fourth Amendment context is evaluated from the perspective of a

"reasonable officer on the scene," considering all the facts and circumstances confronting law

enforcement.  Torres v. City of Madera, 648 F.3d 1119, 1124 (9th Cir. 2011).  In all detention

scenarios, the court must weigh the need for police action against the nature and degree of

inconvenience and intrusion that the detention entails.  See Terry v. Ohio, 392 U.S. 1, 21 (1968);

see also Brown v. Texas, 443 U.S. 47, 51 (1979) (in deciding whether a detention is reasonable,

courts look to "the gravity of the public concerns served by the seizure, the degree to which the

seizure advances the public interest, and the severity of the interference with individual liberty.").

Circumstances under which it may be objectively reasonable to detain a person who is *not*

suspected of having committed a crime include "emergency situations" in which local law

enforcement officers are acting to keep the peace.  See Maxwell v. County of San Diego, 708

F.3d 1075, 1084 (9th Cir. 2013).

　　　　　Here, the facts and circumstances material to the reasonableness of plaintiff's detention

are that the defendant officers were responding to multiple emergency calls regarding shots fired

in a residential neighborhood; the scene was crowded and chaotic, with some persons appearing

intoxicated; there were multiple shell casings at the scene, at least one gun had been discarded by

someone at the scene, and at least one individual was found to be armed; the extent of ongoing

danger accordingly needed to be assessed; and officers were attempting to identify the persons

present and determine which of them had pertinent information about the shooting and which if

any of them might be possible suspects.  For purposes of qualified immunity, the dispositive

question is whether it was clearly established that under these circumstances, it violated the

Fourth Amendment to detain someone who failed to follow directions (or who was perceived as

non-cooperative) for 90 minutes in a patrol car, including 20 minutes in handcuffs, while the

scene was secured and the persons present were identified.  The court must ask whether plaintiff's

asserted right to be free from such detention was "'sufficiently clear' that every 'reasonable

officer would have understood that what he is doing violates that right.'"  Ashcroft v. al-Kidd,

563 U.S. 731, 741 (2011) (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)).  Although

1   a case involving an identical fact pattern is not required, "existing precedent must have placed the

2   statutory or constitutional question beyond debate." Id.

3         In Maxwell, supra, the Ninth Circuit rejected an assertion of qualified immunity where

4   officers had separated and detained witnesses at the scene of a crime for five hours for the sole

5   purpose of gathering information from them, even though the crime had been solved.  The court

6   noted that "there are few cases discussing the reasonability of detaining witnesses solely for

7   investigative purposes," and that "[i]n most cases the lack of on-point precedent would compel us

8   to grant qualified immunity." Id. at 1083.  The court nonetheless held that the multi-hour

9   detention at issue was "obvious[ly]" unconstitutional, in light of its excessive duration and the

10  fact that its *only* purpose was the gathering of information from the detainees.  Id. at 1083-85.

11  The absence of exigency—a public safety concern, an ongoing search, the need to secure a crime

12  scene, or similar law enforcement need serious enough to justify a suspicion-less detention—

13  made the detention obviously unreasonable under clearly established Fourth Amendment

14  jurisprudence.  Id.

15        Maxwell does not defeat defendants' assertion of qualified immunity here.  In this case the

16  detention lasted 90 minutes, not five hours.  Its purpose was not only to obtain information from

17  plaintiff, but primarily to ensure the safe and unimpeded securing of the scene, the identification

18  of any ongoing threat to public safety, and the gathering of evidence related to possible criminal

19  activity.  At the time of plaintiff's detention, the shooter(s) had not been identified.  The facts of

20  Maxwell, in contrast, did not involve any ongoing danger or ongoing need to determine whether

21  danger continued.  Maxwell accordingly does not support plaintiff's position.  To the contrary,

22  the undersigned finds that the case at bar is one of those cases in which the Ninth Circuit has

23  indicated that the lack of on-point precedent compels a grant of qualified immunity.  See id. at

24  1083.

25        Plaintiff argues that because officers did not have reasonable suspicion to believe that he

26  had been involved in the exchange of gunfire or had otherwise committed a crime, it was clearly

27  established that he could not be detained at all.  In support of the proposition that no detention is

28  ever permissible without individualized reasonable suspicion of criminal conduct, and in

opposition to the assertion of qualified immunity on this claim, plaintiff cites cases involving fact patterns entirely unlike this case.  Plaintiff cites <u>Liberal v. Estrada</u>, 632 F.3d 1064, 1076-77 (9th Cir. 2011), which found a Fourth Amendment violation where a traffic stop was conducted without any reason to suspect criminal activity on the part of the motorist, and <u>C.L. v. Grossman</u>, 798 Fed. Appx. 1015, 2020 U.S. App. LEXIS 9449, 2020 WL 1492036 (9th Cir. 2020), which affirmed the denial of qualified immunity where officers had detained and forcefully arrested an autistic individual in a public park because they thought his repetitive hand movements indicated use of an illegal inhalant.  The standards for traffic stops and for detentions rising to the level of arrest, though certainly clear, are not applicable here.  Neither case cited by plaintiff involved police response to a "shots fired" call or an analogous public safety emergency.  Because the need for police action in this case is very different from that in the cited cases, those authorities cannot have put defendants on notice that their actions were unconstitutional.

Elsewhere in his opposition to summary judgment, plaintiff cites <u>Washington v. Lambert</u>, 98 F.3d 1181, 1182 (9th Cir. 1996), in which the plaintiffs had been stopped at gunpoint in the parking lot of their hotel, taken to the ground, forcefully handcuffed, and detained based only on their racial similarity to individuals who had committed a robbery nearby.  Plaintiff also cites <u>Nicholson v. City of Los Angles</u>, 935 F.3d 685, 691 9th Cir. (9th Cir. 2019), which denied qualified immunity for an unlawfully prolonged detention and sustained handcuffing of an individual after probable cause had dissipated.  Neither of these cases would put a reasonable officer on notice that it is impermissible in response to shots fired at a crowded location in a residential neighborhood to detain those present while the scene is secured, possible ongoing threats are identified and neutralized, and any percipient witnesses and/or potential suspects are identified.

In sum, plaintiff's reliance on the rules governing "<u>Terry</u> stops" and traffic stops does not defeat qualified immunity because the facts of this case present a materially different situation. The obvious exigency of the situation at 2027 O'Neil Way, and the related law enforcement needs to secure the scene and identify persons present without interference, are the most salient circumstances affecting the reasonableness analysis required by the Fourth Amendment.  None of

1   the cases cited by plaintiff or identified by the court's research would put reasonable officers on

2   notice that their actions, under the circumstances at 2027 O'Neil Way, violated plaintiff's rights.

3   To the contrary, the Ninth Circuit has acknowledged that some detentions not based on

4   reasonable suspicion that the detainee was personally involved in criminal activity may be

5   justified in emergency situations.  See Maxwell, 708 F.3d at 1084 (citing United States v. Ward,

6   488 F.2d 162, 169 (9th Cir. 1973) (en banc)).  Accordingly, the undersigned finds that the

7   individual officers are entitled to qualified immunity as to the fact of plaintiff's detention.

8          Nothing about the manner of the detention requires a different result.  First, as to duration,

9   no clearly established law would have alerted officers that they were exceeding the bounds of

10  Fourth Amendment reasonableness.  Plaintiff spent approximately 90 minutes in the patrol car.

11  That is not an objectively unreasonable length of time for officers to detain a witness at a "shots

12  fired" scene in a residential neighborhood, while attempting to determine which of the many

13  people present (if any) may have been involved and which of them could provide information

14  relevant to the immediate law enforcement needs of protecting public safety and identifying

15  possible suspects.  The length of plaintiff's detention was not disproportionate to the officers'

16  immediate need to identify those present, secure the scene, preserve any evidence, and ensure

17  public safety.  Plaintiff has identified no evidence demonstrating that his detention exceeded the

18  time it took officers to accomplish those urgent law enforcement tasks.

19         As to the use of handcuffs, the tightness of which is addressed below in relation to

20  plaintiff's excessive force claim, the fact of their use in this context does not make the seizure

21  unreasonable.  Plaintiff's reliance on Washington v. Lambert, supra, is unavailing.  As noted

22  above, that case involved the seizure at gunpoint of two men who were treated as robbery

23  suspects based only on their race and proximity to the robbery.  The facts here, involving

24  plaintiff's presence at a crowded scene where shots had been fired, are not analogous.  Plaintiff

25  was handcuffed because the officers considered him uncooperative during their initial efforts to

26  secure the scene and assure the safety of those present.  Although plaintiff disputes that

27  characterization, the video evidence clearly shows plaintiff failing to do as he was asked.  See

28  Scott v. Harris, 550 U.S. 372, 380-81 (2007) (plaintiff's version of events cannot defeat summary

1  judgment when contradicted by the video evidence).  The Ninth Circuit has recognized both a

2  plaintiff's non-cooperation with officers and the existence of an ongoing public safety threat or

3  recent violent crime as potential justifications for handcuffing that would otherwise be

4  impermissible in the absence of probable cause to arrest.  Washington, 98 F.3d at 1189.

5        Finally, plaintiff remained handcuffed for approximately 20 minutes, which is a relatively

6  brief period of time.  The cuffs were removed when plaintiff complained about pain.  Cf.

7  LaLonde v. County of Riverside, 204 F.3d 947 (9th Cir. 2000) (no qualified immunity where

8  evidence shows officers refused to loosen handcuffs when plaintiff complained of pain); Palmer

9  v. Sanderson, 9 F.3d 1433 (9th Cir. 1993) (same).  Plaintiff has identified no authority, and the

10  undersigned is aware of none, that would have made the illegality of this brief handcuffing

11  apparent to any reasonable officer under the circumstances.  For all these reasons, Officers

12  Hamm, Delgado and Melloch are entitled to qualified immunity on Claim One.

13        3.  Municipal Liability

14        Because section 1983 does not provide for vicarious liability, local governments "may not

15  be sued under § 1983 for an injury inflicted solely by its employees or agents."  Monell v. Dep't

16  of Soc. Servs. of New York, 436 U.S. 658, 694 (1978).  Instead, local government entities can be

17  liable only where the municipality itself causes a constitutional violation through a "policy or

18  custom, whether made by its lawmakers or those whose edicts or acts may fairly be said to

19  represent official policy[.]"  Id.  Municipal liability requires proof both that a policy exists[4] or that

20  a customary practice rises to the level of a policy,[5] and that this policy or custom or practice

21

22  [4]  Conclusory allegations that a policy exists are insufficient to state a Monell claim.  See, AE ex
    rel. Hernandez v. County of Tulare, 666 F.3d 631, 637 (9th Cir. 2012); Starr v. Baca, 652 F.3d

23  1202, 1216 (9th Cir. 2011); Estate of Brooks ex rel. Brooks v. United States, 197 F.3d 1245, 1247
    (9th Cir. 1999).

24  [5]  Absent a formal governmental policy, plaintiff must show a "longstanding practice or custom
    which constitutes the standard operating procedure of the local government entity."  Gillette v.

25  Delmore, 979 F.2d 1342, 1346-47 (9th Cir. 1992), cert. denied, 510 U.S. 932 (1993).  The custom
    must be so "persistent and widespread" that it constitutes a "permanent and well settled city

26  policy."  Monell, 436 U.S. at 691.  "Liability for improper custom may not be predicated on

27  isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency
    and consistency that the conduct has become a traditional method of carrying out policy."

28  Trevino v. Gates, 99 F.3d 911, 918 (9th Cir. 1996) (citations omitted).

1  caused or was the "moving force" behind the violation of plaintiff's rights by the individual

2  municipal actors.  Id.; see also City of Springfield v. Kibbe, 480 U.S. 257, 266-68 (1987)

3  (discussing causation requirement in section 1983 municipal liability cases).

4      Here, plaintiff seeks to hold the City of Sacramento liable for the actions of the officers on

5  the theory that the City has "a custom and a practice of forcing people to be detained and identify

6  themselves even with no reasonable suspicion of a crime, in pursuant to their investigation

7  tactics."  ECF No. 35 at 3.  Plaintiff represents that the City and its expert witness have admitted

8  to having such a custom or practice.  Id.  Plaintiff provides no citation to the record for such an

9  admission, however, and defendants deny having admitted to any unconstitutional policy or

10  customary practice.  It appears that plaintiff is referring to the declaration of defense expert David

11  Blake, Ph.D., whose report he provides as an exhibit.  See ECF No. 35-1 at 15-45.  Dr. Blake

12  nowhere states that City police customarily detain people without legal justification.  Rather, he

13  recites the California Peace Officer Standards and Training (CA-POST) provisions that are

14  applicable to investigative detentions, and he opines based on a comprehensive review of the

15  evidence in this case that the officers reasonably complied with those standards.  Id. at 32-37.

16  Defendants' reply brief states that they "admit that they will stop and detain subjects on an

17  investigatory basis" but maintain that "there is nothing unlawful or unconstitutional in engaging

18  in such conduct if there are articulable reasons to do so."  ECF No. 36 at 6.  Plaintiff's assertion

19  of a concession by defendants is thus belied by the record.

20      The City is entitled to summary judgment on Claim One, because plaintiff has failed to

21  identify evidence sufficient to support essential elements of municipal liability.  See Celotex, 477

22  U.S. at 323.  First, for the reasons stated above in relation to individual officer liability, it does not

23  appear that there was any constitutional violation of plaintiff's rights for which the City could be

24  liable.  Second, even assuming that the officers exceeded the bounds of the Fourth Amendment in

25  relation to plaintiff's detention, he has not identified a policy or established the existence of a

26  custom that could plausibly have cause the officers to disregard their POST training and violate

27  his rights.  To the extent that plaintiff relies on the theory that temporary investigative detentions

28  of persons present at the scene of a shooting, who have not yet been ruled out as potential

1  participants and/or identified as witnesses, is an admitted customary practice that is also

2  unconstitutional, plaintiff is simply wrong about the law.  For the reasons explained above in

3  relation to individual officer liability and qualified immunity, the practices acknowledged by the

4  City and endorsed by POST are not categorically unconstitutional.

5      Plaintiff's conclusory allegations about the prevalence of racist City policies and customs

6  are insufficient to defeat summary judgment.  At his deposition, plaintiff testified in vague and

7  conclusory terms that he was aware of numerous reports showing the City has various

8  (unspecified) unconstitutional policing policies and practices.  Alston Depo. at 100:5-104:19

9  (ECF No. 32-2 at 25-29).  The only report about which he could proffer any concrete information

10  whatsoever, even to identify a general topic, involved traffic stops.  Id. at 104:9-19 (ECF No. 32-

11  2 at 29).  Plaintiff's detention was not a traffic stop, however, so any policy or practice that might

12  be established by a traffic stop report could not support municipal liability here.  In response to

13  the motion for summary judgment, plaintiff has produced none of the reports he referenced in his

14  deposition, and he has identified no other evidence of a policy or custom that proximately caused

15  the alleged violation of his rights.  Because there is a complete failure of proof as to an essential

16  element of municipal liability, the City is entitled to summary judgment on Claim One.

17      B.  Claim Two: Freedom of Speech (First Amendment, 42 U.S.C. § 1983)

18        1.  Overview of Claim

19      The complaint alleges that plaintiff's First Amendment rights were violated when the

20  responding officers interfered with his recording of their interactions and took away his phone.

21  This claim is stated against Officer Melloch and the City.  ECF No. 1 at 6-7.

22        2.  Officer Liability

23      Defendants again assert qualified immunity.  Federal law has long been clear that there is

24  a First Amendment Right to photograph and record "matters of public interest," including

25  interactions with police officers in public spaces.  Fordyce v. City of Seattle, 55 F.3d 436, 439

26  (9th Cir. 1995); Askins v. U.S. Dep't of Homeland Sec., 899 F.3d 1035, 1044 (9th Cir. 2018); see

27  also, Reed v. Lieurance, 863 F.3d 1196, 1211 (9th Cir. 2017) (referencing "the First Amendment-

28  protected activity of observing a government operation" and citing Fordyce as "recognizing a

1    'First Amendment right to film matters of public interest' – in that case, police actions during a

2    public demonstration" (quoting Fordyce, 55 F.3d at 439)).[6]  However, the established law

3    regarding the right to record police interactions does not directly address the right of an individual

4    to record *while detained*.

5         The facts related to the removal of plaintiff's phone are somewhat unclear.[7]  In any event,

6    there is no allegation or evidence that plaintiff was prevented from recording police at the scene

7    until he was placed in the patrol car for reasons unrelated to his recording, at which time his cell

8    phone was taken from him as an officer safety precaution.[8]

9         Plaintiff quotes from Askins, supra, which he cites for the proposition that "*all* filming is

10   legal if the government official is in the public."  ECF No. 35 at 9 (emphasis added).  But neither

11   Askins nor any of the cases it cites in the paragraph quoted by plaintiff, id., involved a factual

12   scenario analogous to that presented in here, in which the would-be video recorder is being

13   detained for reasons of public safety and officer safety that are independent of any First

14   Amendment activity.  In Askins, plaintiffs were advocates on border policy issues who contended

15   that the California Border Patrol's policies against recording imposed "unconstitutional

16   restrictions on their First Amendment right to photograph and record CBP officers engaging in

17   the public discharge of their official duties."  899 F.3d at 1043.  Askins was detained, but only

18   after and because he took photographs; the right to film recognized by the court did not involve

19   _____

20   [6]  Reed did not itself involve recording.  The plaintiff in that case claimed a First Amendment
     right to observe an interagency governmental operation to herd buffalo into Yellowstone National
21   Park.  He challenged his involuntary removal from an observation point under the First
     Amendment, and his arrest for obstructing the operation under the Fourth Amendment.
22   [7]  The undisputed facts, as set forth above, are consistent with plaintiff's phone not having been
23   confiscated by the police but passed on to an individual who continued to record from outside the
     patrol car and with whom plaintiff conversed freely.  See supra at p. 8.
24   [8]  In discovery, plaintiff expressly admitted that he was told "that allowing detained individuals to
     have a cell phone was an officer safety issue."  ECF No. 32-3 at 51 (plaintiff's response to RFA
25   No. 11) (Ex. 4 to Day Decl.); ECF No. 32-3 at 17 (Alston Depo. 70:7-10) (Ex. 1 to Day Decl.).
     Plaintiff attempts to dispute the same fact in opposition to summary judgment, ECF No. 35-2 at
26   11 (response to DUF 39), but the evidence he cites does not defeat his prior admissions.  The
     undersigned has reviewed the specific patrol vehicle camera footage to which plaintiff refers, and
27   the fact that it does not capture the statement does not support an inference that no such statement
28   was made.

1  filming while in detention.  Id. at 1039, 1043.

2          The authorities cited by the Askins court also dealt with filming by persons who were

3  themselves undetained observers.  In Animal Legal Defense Fund v. Wasden, plaintiff challenged

4  an Idaho statute on constitutional grounds, arguing that it prevented protected investigative

5  journalism.  878 F.3d 1184, 1192 (9th Cir. 2018).  In Fordyce, supra, the plaintiff was recording

6  police at a protest, and his subsequent arrest was recording-related.  55 F.3d at 438.  In American

7  Civil Liberties Union of Illinois v. Alverez, an advocacy organization was challenging an Illinois

8  "eavesdropping statute" that made it a felony to record conversations unless all parties' consent.

9  679 F.3d 583, 586 (7th Cir. 2012).  In Glick v. Cunniffe, plaintiff was a bystander who "was

10  arrested for using his cell phone's digital video camera to film several police officers arresting a

11  young man."  655 F.3d 78, 79 (1st Cir. 2011).[9]  These cases all involved the rights of journalists

12  and observers (whether advocates or bystanders) to record the actions of law enforcement

13  officers.  None of them recognized, or fairly imply, a right to record on the part of a person who is

14  being lawfully detained—for reasons unrelated to any First Amendment activity—in the

15  immediate aftermath of a threat to public safety.

16          The distinction is significant because the Constitution permits reasonable time, place and

17  manner restrictions on otherwise protected First Amendment activity.  See Askins, 899 F.3d at

18  1044; see also Glick, 655 F.3d at 85 (the right to record police activity is "not unqualified").  In

19  Kelly v. Borough of Carlisle, the Third Circuit found that there is not a clearly established right

20  for a person to videotape police while they are pulled over on a traffic stop, because traffic stops

21  have been characterized as an "inherently dangerous situation."  622 F.3d 248, 262 (3rd Cir.

22  2010).  The Kelly court noted that the right to videotape police "is subject to reasonable time,

23  place, and manner restrictions, as long as they are 'justified without reference to the content of the

24  regulated speech, . . . are narrowly tailored to serve a significant governmental interest, and . . .

25  leave open ample alternative channels for communication of the information."  Id. (quoting Ward

26  ────────────────

27  [9]  The quoted portion of Askins also cited Smith v. Cumming, 212 F.3d 1332, 1332 (11th Cir. 2000), in which plaintiffs alleged that they were harassed by police and prevented from videotaping police actions.  In a very short opinion that omits the factual background, the

28  Eleventh Circuit court held that plaintiffs' rights were not violated.  Id.

1   v. Rock Against Racism, 491 U.S. 781, 791 (1989)).  This familiar First Amendment rule appears

2   to permit the restriction at issue here.

3       As in Kelly, the restriction of plaintiff's ability to record while being temporarily detained

4   appears to have been reasonably related to legitimate law enforcement needs.  At the scene,

5   defendants asserted an officer safety justification for the removal of cell phones from individuals

6   detained in the back of a patrol vehicle. [10]  Although defendants have not elaborated on that

7   justification here, it is readily apparent that the investigation of shots recently fired in a residential

8   neighborhood—where at least one firearm was observed being discarded at the scene, another

9   was taken from an individual being questioned by police, two clusters of bullet casing had been

10  found, and numerous members of the crowd appeared to police to be intoxicated—involves an

11  "inherently dangerous situation."  Accordingly, the removal of objects from persons temporarily

12  detained is not patently unrelated to officer safety.  Moreover, a cell phone is not just a camera or

13  tape recorder; it is a means of communication.  In the immediate aftermath of a "shots fired"

14  event, it may be legitimate for police to prevent witnesses and potentially involved parties from

15  communicating with each other while they sort out who is who.  Preservation of evidence, the

16  integrity of witness reports, and officer safety all therefore may support a temporary suspension

17  of cell phone use by persons who are being detained.  In any event, such considerations

18  distinguish the facts here from the First Amendment cases on which plaintiff relies in opposition

19  to defendants' assertion of qualified immunity.

20      It is significant that officers in this case did not categorically prohibit the recording of

21  plaintiff's detention; they denied plaintiff personal access to his cellphone, for any purpose, while

22  he was detained in a patrol car.  The only recordings that were prevented were those that could

23

24  _____

    [10]  In discovery, plaintiff expressly admitted that he was told "that allowing detained individuals

25  to have a cell phone was an officer safety issue."  ECF No. 32-3 at 51 (plaintiff's response to
    RFA No. 11) (Ex. 4 to Day Decl.); ECF No. 32-3 at 17 (Alston Depo. 70:7-10) (Ex. 1 to Day

26  Decl.).  Plaintiff attempts to dispute the same fact in opposition to summary judgment, ECF No.
    35-2 at 11 (response to DUF 39), but the evidence he cites does not defeat his prior admissions.

27  The undersigned has reviewed the specific patrol vehicle camera footage to which plaintiff refers,
    and the fact that it does not capture the statement does not support an inference that no such

28  statement was made.

1   have been taken from inside the patrol car.  Recording from outside the patrol car continued

2   unimpeded, as documented in plaintiff's own exhibits.

3          For all these reasons, the undersigned is skeptical of plaintiff's assertion that he had a First

4   Amendment right to record while in the patrol car.  But this court need not decide that question.

5   Officer Melloch is entitled to qualified immunity because there was at the time of plaintiff's

6   detention no "clearly established" First Amendment right for a person detained during police

7   investigation of a dangerous situation to retain a recording device for the purpose of personally

8   recording this own detention.  As the previous survey of authority demonstrates, a reasonable

9   officer cannot have been expected to conclude that the First Amendment right of bystanders and

10  observers to record police actions in public forums limited their ability to remove a cell phone

11  from a person who was being detained pending identification because he was at the scene of a

12  shooting and failing to cooperate.  The law simply did not give defendant "fair warning" that his

13  conduct in removing the phone was unconstitutional.  See Hope v. Pelzer, 536 U.S. 730, 739

14  (2002) (although officials can be on notice that their conduct violates established law even in

15  novel factual circumstances, the law must give the defendant officer "fair warning" that his or her

16  conduct was unconstitutional).  Accordingly, Officer Melloch is entitled to summary judgment on

17  grounds of qualified immunity.

18          3.  Municipal Liability

19          Defendants seek summary judgment on the issue of municipal liability as to all of

20  plaintiff's federal claims, on the common ground that plaintiff has not produced evidence that any

21  of the alleged constitutional violations were proximately caused by any policy or custom of the

22  City.  ECF No. 32-1 at 4-6.  The only claim as to which plaintiff responded with any showing

23  intended to defeat summary judgment is Claim One, discussed previously.  See ECF No. 35 at 2-3

24  and *passim*.  Plaintiff has identified no evidence of a policy, or of a custom with the force of

25  policy, that caused the alleged violation of his First Amendment rights.  This failure of proof on

26  an essential element of Monell liability entitles the City to summary judgment whether or not

27  Officer Melloch is also entitled to summary judgment.  See Celotex, 477 U.S. at 323.

28  ////

C.  Claim Three: Excessive Force (Fourth Amendment, 42 U.S.C. § 1983)

    1.  Overview of Claim

The complaint alleges that plaintiff was subjected to excessive force when he was handcuffed too tightly.  The claim is stated against Officer Delgado and the City.  ECF No. 1 at 7-8.

    2.  Officer Liability

Defendants again rely on qualified immunity.  Here the court begins with the first prong of the qualified immunity analysis, asking whether, construing the evidence in plaintiff's favor, Officer Delgado violated the Fourth Amendment.  The objective reasonableness of force is evaluated in the context of the circumstances facing the officer.  Graham v. Connor, 490 U.S. 386, 396 (1989).  The relevant circumstances include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  Id.  In this case plaintiff was not handcuffed pursuant to an arrest, but as part of police efforts to secure the scene of a shooting.  The court has already found in relation to Claim One that the officers involved in plaintiff's detention are entitled to qualified immunity regarding the fact that plaintiff was placed in handcuffs.  The distinct question on Claim Three is whether the manner in which the handcuffs were used rose to the level of excessive force.

Although applying handcuffs in an abusive manner can constitute excessive force, see Hansen v. Black, 885 F.2d 642, 643 (9th Cir. 1989), the facts here do not support a finding that Officer Delgado acted in an abusive manner.  Plaintiff has identified no evidence that more than minimal force was employed in the application of the handcuffs.  Delgado's body camera footage (ECF No. 19, Ex. A) does not show any roughness or use of force.  See Scott, 550 U.S. at 380-81 (summary judgment proper where video evidence refutes plaintiff's assertions).  The evidence here is entirely unlike that in Wall v. County of Orange, 364 F.3d 1107 (9th Cir. 2004), cited by plaintiff, in which the plaintiff was smashed face first into a car, forcefully handcuffed, then lifted by his handcuffed arms and thrown into a patrol car.  Plaintiff's other authorities are equally inapposite.  In both LaLonde v. County of Riverside, 204 F.3d 947 (9th Cir. 2000), and Palmer v.

1   Sanderson, 9 F.3d 1433 (9th Cir. 1993), the defendant officers refused to loosen handcuffs when

2   the plaintiff complained of their tightness; here they did so.

3       Claim Three rests entirely on the "tightness" of the cuffs and the pain that plaintiff

4   experienced during the 20 minutes he was handcuffed.  ECF No. 1 at 4, 7-8.  Plaintiff's subjective

5   experience of pain, without more, cannot establish a constitutional violation because even the

6   deliberate infliction of pain does not necessarily violate the Fourth Amendment.  See, e.g.,

7   Forrester v. City of San Diego, 25 F.3d 804, 806-07 (9th Cir. 1994) (use of "pain compliance

8   techniques" not inherently unreasonable).  It is undisputed that plaintiff's handcuffs were

9   removed after 20 minutes due to plaintiff's complaints of pain.  Under the circumstances of the

10  ongoing efforts to secure the scene at 2027 O'Neil Way, the failure to respond to plaintiff's

11  complaints by removing his handcuffs sooner does not rise to the level of an objectively

12  unreasonable use of force.

13      Plaintiff relies on Washington v. Lambert, discussed above in relation to Claim One, for

14  the proposition that the constitution permits handcuffing only when police satisfy a four-factor

15  test establishing that the detainee poses a threat to officer safety.  ECF No. 35 at 11.  In

16  Washington the court noted that absent probable cause for arrest, use of handcuffs and other

17  restraints will violate the Fourth Amendment "[u]nder ordinary circumstances."  Such methods

18  may be permissible, however, "1) where the suspect is uncooperative or takes action at the scene

19  that raises a reasonable possibility of danger or flight; 2) where the police have information that

20  the suspect is currently armed; 3) where the stop closely follows a violent crime; and 4) where the

21  police have information that a crime that may involve violence is about to occur."  Washington,

22  98 F.3d at 1189.  In this case, the officers were responding to a possible violent crime (or at least

23  a serious threat to public safety) and plaintiff was uncooperative at the scene.  Washington thus

24  supports defendants' position rather than plaintiff's.

25      In any event, none of the authorities cited by plaintiff or identified by the court would

26  have made it clear that keeping plaintiff in handcuffs for 20 minutes was unconstitutional under

27  the circumstances.  Certainly, existing precedent did not put the question beyond debate.  See

28  Ashcroft v. al-Kidd, 563 U.S. at 741.  Accordingly, Officer Delgado is entitled to qualified

1     immunity.

2          3.   <u>Municipal Liability</u>

3          As with Claim Two, plaintiff has identified no evidence of a policy or a custom with the

4   force of policy that caused a violation of his First Amendment rights.  This failure of proof on an

5   essential element of <u>Monell</u> liability entitles the City to summary judgment.  <u>See</u> <u>Celotex</u>, 477

6   U.S. at 323.

7        D.   <u>Claim Five: Right to Remain Silent (Fifth Amendment, 42 U.S.C. § 1983)</u>

8          The complaint alleges that plaintiff's Fifth Amendment rights were violated by his

9   questioning at the scene after he had invoked his constitutional privilege not to talk to the police.

10   ECF No. 1 at 9.  Defendants argue that this claim is foreclosed by <u>Chavez v. Robinson</u>, 12 F.4th

11   978, 999 (9th<sup>h</sup> Cir. 2021), which held that a Fifth Amendment violation will not support a Section

12   1983 claim unless the plaintiff made a statement that was used against him in a criminal

13   proceeding.  ECF No. 32-1 at 6.  In response, plaintiff concedes that he cannot maintain a Fifth

14   Amendment claim.  ECF No. 35 at 2.  Accordingly, defendants' motion for summary judgment

15   should be granted as to Claim Five.

16        E.   <u>Claim Six: Equal Protection (42 U.S.C. § 1983)</u>

17          The complaint alleges that only Black males were detained at the scene, thus

18   demonstrating intentional racial and gender discrimination.  ECF No. 1 at 9-10.  The claim is

19   asserted against the three individual officers and the City.  "To state a claim for violation of the

20   Equal Protection Clause, a plaintiff must show that the defendant acted with an intent or purpose

21   to discriminate against him based upon his membership in a protected class."  <u>Serrano v. Francis</u>,

22   345 F.3d 1071, 1082 (9th Cir. 2003) (citing <u>Barren v. Harrington</u>, 152 F.3d 1193, 1194 (9th Cir.

23   1998)).  Here, plaintiff has failed to identify any evidence that could support a finding of

24   intentional discrimination.

25          Plaintiff argues that people of "all different races were detained from coming out of the

26   home like everyone else, not actual seizures, or patrol car detainments, and slave chattel

27   recreations, as only the black men were exhibited to."  ECF No. 35 at 14.  Plaintiff also argues the

28   fact that a woman with children was allowed to leave the scene demonstrates that defendants were

1  targeting men.  Id.  Neither of these assertions demonstrates that defendants detained plaintiff

2  based on his status as a Black male.  Plaintiff does not dispute that he was told he was detained

3  "for multiple reasons including because he was making the scene unsafe."  ECF No. 35-2 at 10

4  (response to DUF 33).  He has identified no evidence that would support an inference those

5  reasons for detention were pretextual, and his own denial that he personally posed a safety threat

6  does nothing to generate an inference that racism was the real reason for his detention.  Plaintiff

7  stipulates he did not hear a single officer use or make any racial comments.  Id. at 17 (response to

8  DUF 60).  Finally, plaintiff agrees he "only identified Officer Melloch as acting with racial

9  animus because two African American males were in the back of his patrol car."  Id. at 19.

10  (response to DUF 61).  The fact that plaintiff and another Black male were in the back of Officer

11  Melloch's car, without more, does not support an inference of intentional racial and/or gender

12  discrimination.

13       There is simply no evidence indicating that plaintiff's Fourteenth Amendment equal

14  protection rights were violated.  Moreover, plaintiff has identified no evidence of a City policy or

15  custom that proximately caused the alleged acts of discrimination.  Conclusory allegations of

16  disparate treatment, whether at 2027 O'Neil Way or more broadly as a characteristic of City

17  policing, are insufficient to defeat summary judgment.  All defendants are entitled to summary

18  judgment on this claim.

19       F.  State Law Claims

20       Plaintiff's remaining causes of action (Claim Four, Bane Act; Claim Seven, Battery; and

21  Claim Eight, False Imprisonment) are all based on California law.  Because defendant is entitled

22  to summary judgment on all claims brought under federal law, this court should decline to

23  exercise supplemental jurisdiction over plaintiff's state law claims.  Carnegie-Mellon Univ. v.

24  Cohill, 484 U.S. 343, 350 (1988) (when federal claims are eliminated before trial, district courts

25  should usually decline to exercise supplemental jurisdiction); Lima v. U.S. Dep't of Educ., 947

26  F.3d 1122, 1128 (9th Cir. 2020) (no abuse of discretion where district court declined to exercise

27  supplemental jurisdiction over state law claims after granting summary judgment on federal

28  claims); Whalen v. McMullen, 907 F.3d 1139, 1153 (9th Cir. 2018) (same).  The undersigned

1  takes no position on whether plaintiff would be able to successfully pursue these claims in state

2  court.

3                                    **V.      Conclusion**

4         For all the reasons explained above, IT IS HEREBY RECOMMENDED that defendants'

5  motion for summary judgment (ECF No. 32) be GRANTED, that judgment be entered

6  accordingly in defendants' favor, and that this case be closed.

7         These findings and recommendations are submitted to the United States District Judge

8  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1).  Within twenty-one days

9  after being served with these findings and recommendations, any party may file written

10  objections with the court and serve a copy on all parties.  Id.; see also Local Rule 304(b).  Such a

11  document should be captioned "Objections to Magistrate Judge's Findings and

12  Recommendations."  Any response to the objections shall be filed with the court and served on all

13  parties within fourteen days after service of the objections.  Local Rule 304(d).  Failure to file

14  objections within the specified time may waive the right to appeal the District Court's order.

15  Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d 1153, 1156-57

16  (9th Cir. 1991).

17         IT IS SO ORDERED.

18  DATED: October 10, 2023

19

20                                    ALLISON CLAIRE
                                      UNITED STATES MAGISTRATE JUDGE

21

22

23

24

25

26

27

28

26